## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN BOZUE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-01656-SRC |
| | ) | |
| MUTUAL OF OMAHA INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant(s). | | |

### Memorandum and Order

Susan Bozue was ready for promotion to General Manager at Mutual of Omaha Insurance Company.  Confident in her success as a General Sales Manager, Bozue attended a promising interview and delivered a successful presentation.  But she soon learned that Mutual gave the job to Elias Corpas, a man from outside the company, who she believed to be less qualified for the job.  Convinced that Mutual's executives opposed her promotion because of her sex, Bozue resigned.  She filed suit against Mutual under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) *et seq.*, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.010 *et seq.*, for sex discrimination, claiming failure-to-promote and constructive discharge.  Mutual maintains that it decided to hire Corpas due to neutral factors and that no evidence demonstrates any discrimination due to Bozue's sex.  Mutual moves for summary judgment, Doc. 42, which the Court grants.

## I.     Background and facts

Except as otherwise noted, the Court finds the following facts not genuinely in dispute in this case.

### A.      Susan Bozue's work history at Mutual

In the summer of 2013, Susan Bozue applied to be a General Sales Manager at Mutual of Omaha's Gateway Division in St. Louis.  Bozue Dep. 29:6–11.  Bozue had experience as an insurance agent, a manager of insurance agents, and a trainer of insurance agents.  Bozue Dep. 37:23–38:3.  The Assistant General Manager of the Gateway Division, Shawn Powell, told her she "was very qualified" and that "we want you to be the [General] Sales Manager, but we'd like you to become an agent first and show us you can sell."  *Id.*; Bozue Dep. 37:23–38:3 and 49:6–8.  Powell told Bozue that Mutual would promote her to General Sales Manager in three to five months.  *Id.*  Bozue asked Powell why she had to be an agent first, and he told her "I don't know.  It doesn't make sense.  We were just told that we can't bring you on as a manager at this time."  Bozue Dep. 38:5–7 and 38:12–15.  The General Manager, Brian Askins, told Bozue at the time that the directive came from "upper [m]anagement."  Doc. 48-11.

Bozue began at Mutual as an insurance agent in October 2013.  Doc. 48-4.  Mutual's Regional Sales Manager, Gary Tsomous, told Bozue that Mutual required all General Sales Managers to be agents first.  Bozue Dep. 59:5–12.  But Mutual did not require the same of its male General Sales Managers.  Mutual hired a man named Cody Webster as a Gateway Division General Sales Manager the month before Bozue began working at Mutual.  Bozue Dep. 76:23–77:8 and 192:1–12; Doc. 48-16 at ¶ 19.  Mutual also hired two other men, Bob Barnett in 2015 and Paul Rone in 2016, directly as Gateway Division General Sales Managers.  *Id.*  Mutual did not first require these three men to work first as agents.

Tsomous told Bozue that in order to become a General Sales Manager she needed to attain Bronze status as an agent by getting "30 applications in 90 days" and "bring[ing] on two new agents."  Bozue Dep. 39:24–40:55, 6:24–57:1, 59:13–19.  Bozue completed these

2

requirements within 60 days. *Id.* Over the next months, Mutual changed the requirements for Bozue to become a General Sales Manager four more times, each time mandating that she meet additional sales and recruiting benchmarks in order to attain promotion. Bozue Dep. 56:24–57:1, 59:13 –19, 57:9 – 12, *et seq.*; Doc. 48-16 at ¶ 18.

In August 2014, after Bozue spent over nine months achieving each new set of requirements, Mutual promoted Bozue to General Sales Manager. Doc. 48-4. As a General Sales Manager, Bozue was responsible for recruiting, training, and coaching agents to achieve certain performance metrics, developing market strategies, and supervising the agents assigned to her. Docs. 48-5, 48-6, 48-7, 48-8. Bozue received praise from her supervisors for her work. Doc. 48 at ¶ 4. For example, Bozue alleges that her second level manager, Regional Sales Director Kirt Cochran, told Bozue that she was "one of our best [General] Sales Managers" and that she was one of his "favorites." Bozue Dep. 208:22–209:21. Tsoumas also frequently told Bozue that she was "one of the best hires" he had ever made. *Id.*

In 2014, Bozue's supervisor, Bo Marshall, wrote in her performance review that Bozue "maintains a great attitude" and "does a great job teaching and coaching the sale of Needs Based products and supporting our IBFA [Insurance Based Financial Advising] culture." Doc. 48-5. In 2015, Bozue earned the Sales Leader Roundtable award for her performance. Doc. 9; Bozue Dep. 90:15–91:7. She again received praise from Marshall, who complimented her needs-based-selling culture and commented that "she has developed a strong IBFA culture." Doc. 48-6.

In 2016, Bozue earned the Sales Leader Roundtable award again and exceeded her team production goals for the second year in a row. Doc. 48-7; Bozue Dep. 91:21 – 92:4. She also exceeded her career start date agent recruiting goal by 33%. Doc. 48-7. And in early 2017,

Bozue ranked 14 out of 100 General Sales Managers in the Net First Year Commission

Production category.  Bozue Dep. 119:21–23; Cochran Dep. 145:18–146:4.

Bozue claims that despite her success as a General Sales Manager, she fought against

unequal treatment from her supervisor.  Marshall frequently assigned agents with less experience

to her team, while assigning veteran agents to the five other male General Sales Managers in the

Gateway Division.  Doc. 48-26; Bozue Dep. 193:23–194:11, 199:14–22, 195:7–18, 201:14–19.

Due to these staffing assignments, the male General Sales Managers had the potential to earn

better commissions from more experienced agents.  *Id.*  Although Bozue asked for agents with

more experience, Marshall repeatedly denied her requests.  Bozue Dep. 197:20–198:9; 196:10–

23, 199:4–22, *et seq.*; Doc. 48-16 at ¶ 21.

Additionally, Bozue reports that Marshall held her to higher standards than the five male

General Sales Managers in the Division.  Bozue Dep. 215:22–216:19; Doc. 48-16 at ¶ 25.

Although Bozue generally performed better than her peers, she says Marshall was critical of her

work during weekly meetings, asking harsh questions like "did you do this?" and "why haven't

you done this?"  *Id.*  Bozue claims Marshall did not ask the same questions of the male General

Sales Managers.  *Id.*

In May 2017, Marshall left his position as the Gateway Division General Manager.

Cochran Dep. 122:17–123:4.  Bozue's second level manager, Kirt Cochran, told Bozue to "take

over things" and "handle" the Gateway Division offices.  *Id.*  Bozue claims that she took on the

role of an interim General Manager, but Mutual asserts that Cochran did not treat her as an

interim General Manager or give her that role.  Cochran Dep. 122:17 – 123:4.  Bozue claims she

even earned a $7,500 bonus in August 2017 for running the Gateway Division on her own for

several months without a General Manager.  Bozue Dep. 162:24–163:5; Cochran Dep. 127:21–24.

**B.      Bozue's candidacy for the General Manager position**

In May 2017, Bozue applied for Marshall's former position as the Gateway Division General Manager.  Doc. 50 at ¶ 2.  General Managers are responsible for overseeing the General Sales Managers as well as developing strategies to achieve growth and profitability in their Division.  Doc. 48-1.  According to Mutual, the qualifications for the General Manager position were:

- Broad and seasoned experience in insurance industry with in-depth knowledge of insurance industry practices and trends, current sales methodology, business and personnel; management principles and practices, multi-line insurance fundamentals, state and federal legislation.
- Proven sales and management experience in an Agency Sales distribution.
- Strong leadership, communication, judgment, and strategic planning with prudent risk-taking abilities.
- Ability to persuade, convince, influence and impress others to gain support and the ability to teach or foster development in others.
- Strong employee and agent recruiting, selection, training and retention skills.
- Must possess Series 6 (Investment Company/Variable Contracts Limited Representative) and Series 63 (Uniform Securities State Law Exam) registrations within 90 days of placement in the Position.
- Must possess or attain Series 26 (Investment Company/Variable Contracts Limited Principal) within 90 days of receiving Securities License (S6 & S63).
- Ability to travel up to 50% of the work period (which may include some overnight) and a valid driver's license.

Doc. 43-1 at ¶ 3.

Mutual pre-screened the candidates for the General Manager position to ensure that the candidates met certain qualifications.  Doc. 50 at ¶ 4.  Mutual claims that the pre-screening determined whether the candidates had the requisite professional licenses, knowledge of insurance industry practices and trends, knowledge of insurance products, experience in recruiting and training sales agents, and relevant experience managing an agency sales office,

among other qualifications.  Wilke Dep. 76:5-76:7, 81:5–81:15.  Bozue disagrees with this account, maintaining that Mutual's actual pre-screening questions did not include whether candidates had experience in recruiting and training sales agents, whether candidates could describe that experience, or whether candidates were willing to travel up to 50% of the time. Doc. 50 at ¶ 4; Doc. 50-2.

After prescreening and initial interviews, the final four candidates for the position were: Susan Bozue (female), Elias Corpas (male), Samuel Dryer (male), and Donald Thomas (male). Doc. 50 at ¶ 5.  The four candidates traveled to Omaha, Nebraska for one-on-one interviews, panel interviews, and presentations before several of Mutual's executives.  Doc. 50 at ¶ 6. According to Mutual, the final decision rested with four individuals: 1) Kirt Cochran, male, Regional Sales Director (the General Manager would report directly to him); 2) AJ Skar, male, Vice President of Agency Sales and National Sales Manager (Cochran reports to him); 3) Rich Healey, male; Senior Vice President of Agency Sales (Skar reports to him); and 4) Meghan Wilke, female, Director of Advisor Development.  Doc. 43 at ¶ 7; Def. Answer to Int. Nos. 8–9. Bozue disputes that those four individuals had an equal role in the decision.  Doc. 50 at ¶ 7. Bozue claims that the final hiring decision truly rested with AJ Skar and Rich Healey, the highest-level executives who were involved in the decision, as Cochran confirmed in his deposition that "the input of AJ Skar and Rich Healey has more weight in deciding who becomes a . . . GM versus all of the other managers who have input into the decision."  Doc. 50-3; Cochran Dep. 57:3–6, 58:20–23, and 158:12–24.

Mutual selected an outside candidate, Elias Corpas, for the General Manager position, and Corpas started on September 1, 2017.  Doc. 50 at ¶ 8.  In Cochran's view, Bozue and Corpas were the top two candidates for the position, but Mutual points out that Skar did not consider

Bozue to be one of the top two candidates for the job.  Cochran Dep. 260:7–12; Skar Dep. 169:3–169:11.  Throughout the process, however, Bozue was not aware of Cochran, Healey, Skar, or Wilke saying anything negative about Bozue's gender at any time.  Doc. 50 at ¶16.

### C.    Bozue's exit from Mutual

Bozue first learned that she did not get the job during a meeting with Cochran and Wilke in August 2017.  Bozue Dep. 151:15–152:23.  Bozue alleges that Cochran told her that she "scored the highest on the presentation" but that the successful candidate was someone from outside the company with "more experience building bigger teams." *Id.*  Mutual denies that Cochran told Bozue either of these things, pointing to Bozue's statement in her deposition that Wilke did most of the talking during the meeting.  Doc. 57 at ¶ 20, 50.

Shortly after her meeting with Cochran and Wilke, Bozue spoke to Cochran about the hiring decision.  She stated her belief that Mutual was a "good old boy company," and asked "if any part of this had to do with me being female?"  Bozue Dep. 154:19–155:15; Cochran Dep. 257:6–14.  Cochran denied Bozue's suggestion, admonishing her: "Oh, Susan, don't say that." *Id.*  Cochran later told Skar about what Bozue had said but Cochran took no further action. Cochran Dep. 258:4–11.

Bozue claims that after Corpas started as General Manager, she continued doing the General Manager's duties and even trained Corpas.  Bozue Dep. 222:4–19 and 223:16–24; Doc. 48-16 at ¶ 27.  Bozue says that agents would come to her after requesting assistance from Corpas, the agents complaining that meeting with Corpas was a "waste of time." *Id.*  Mutual, however, disputes that agents ever went to Bozue for help.  Corpas Dep. 187:14-188:16.

In the fall of 2017, Bozue lost four agents from her team because they lived in the newly created Greater Ozark Division.  Doc. 48-16 at ¶ 28.  Although Bozue recruited and trained those

7

agents, she no longer earned commissions based on their performance. *Id.* To make up for the loss of these agents, Bozue asked that Mutual assign her two agents whom she frequently coached. Doc. 48-16 at ¶ 30. Cochran and Corpas refused her request, and Bozue claims that she continued to assist those agents even though she would not receive compensation for their performance. *Id.*

Bozue alleges that Corpas belittled Bozue's contributions to the division. Bozue claims Corpas made fun of her in a meeting when Corpas said: "Well, everybody, let's hear it for Susan because she actually had a good idea for once." Bozue Dep. 220:22–221:14, 221:4–22. Mutual denies that Corpas made fun of Bozue, however, claiming that Corpas was just playing off a joke that Bozue had made about how she sometimes had good ideas. Corpas Dep. 205:25-207:8. Bozue also asserts that Corpas was sarcastic with her when she tried to help him better understand Mutual's products, policies, and software. Bozue Dep. 223:16–24.

On February 9, 2018, after working under Corpas for five months, Bozue resigned her employment with Mutual. Doc. 50 at ¶ 15. Bozue states that she believed she would not be able to advance within Mutual because she is a woman. Dep. 265:2 – 7. On April 27, 2018, Bozue filed her Charge of Discrimination alleging Mutual discriminated against her because of her sex. Doc. 50 at ¶ 18.

### D. Bozue and Corpas's qualifications

Bozue asserts that a significant amount of overlap exists in the job duties and skills necessary to be a successful General Manager and General Sales Manager. Doc. 48 at ¶ 14. Wilke confirmed that there is "a lot of overlap of the job duties and the skills that are necessary" for the two positions. Wilke Dep. 47:18–22. Both positions require a strong "needs-based selling" strategy; strong skills for fostering and developing agents; strong agent recruiting and

training skills; and in-depth knowledge of Mutual's products. Wilke Dep. 45:19–46:22; Cochran Dep. 108:24–112:17.

At the time of her application, Bozue had worked in human resources for over 17 years, with a focus on recruiting and hiring personnel. Doc. 48-16 at ¶ 4. Before working at Mutual, Bozue had recruited 12 agents. Doc. 48-16 at ¶ 5. During her three and a half years at Mutual, Bozue recruited 39 agents and managed up to 21 agents at a time as a General Sales Manager. Doc. 48-14; 48-16 at ¶ 5. Furthermore, Bozue's agents did not receive a base salary; they were commission-only. Bozue Dep. 259:25–260:2; Doc. 48-16, ¶6.

Meanwhile, Corpas only recruited 18 agents and managed about 21 agents during his career. Corpas Dep. 46:23–47:10, 51:8–52:8. Corpas testified that he recruited and managed agents who received a base salary plus commission rather than working for commission only. Corpas Dep. 32: 5–8, 46:23–47:10, 51:8–52:8, 80:9–11, 81:10–18; Cochran Dep. 21:23-22:2. Corpas also admitted that having a base salary was helpful to him when he was an agent developing his business. *Id.*

Bozue had substantial knowledge about Mutual's products and systems compared to Corpas. Doc. 48-4; Doc. 48-16 at ¶ 9. Cochran admitted in his deposition that Bozue had a better understanding of Mutual's policies and more robust relationships with Mutual's agents compared to Corpas. Cochran Dep. 240:12–16, 240:7–11.

Bozue also presented evidence of her strong communications skills and positive workplace outlook. Many of Bozue's agents confirm that they relied on her to liaison with Mutual's corporate office and the underwriters when problems arose with their clients. Doc. 48-13, Doc. 48-12, Doc. 48-5; Doc. 48-6; Doc. 48-7; Doc. 48-16 at ¶ 10. And Bozue's performance reviews declare that she had a "great attitude," "great presence in the office" and maintained

"strong relationships across her team and work[ed] tirelessly to help them achieve success." Doc. 48-5; Doc. 48-6; Doc. 48-7.

When she applied for the General Manager position, Bozue had about 17 years of management experience.  Doc. 48-16, ¶12.  Bozue had managed insurance agents using the needs-based-selling method for over five and a half years by the time of her application.  *Id.*; Doc. 48-4; Doc. 48-5; Doc. 48-6; Doc. 48-7.

Corpas only had 7 years of management experience total with just 4 years in the insurance business.  Doc. 48-17.  Unlike Bozue, he had no experience managing supervisors. Corpas Dep. 50:13–24, 80:2–4.  Corpas only listed 4 years of management experience on his resume because the other management experience was "so far back."  Doc. 48-17; Corpas Dep. 114:24–115:6.  Healey acknowledged in his deposition that Bozue had more supervisory experience than Corpas.  Healey Dep. 155:10–12.  And Cochran admitted that Bozue had more years of management experience and experience managing commission-only agents compared to Corpas.  Cochran Dep. 232:20–233:3, 234:6–10.

Finally, Bozue had substantial training experience compared to Corpas.  Doc. 48-16 at ¶ 13.  She had trained insurance agents on the needs-based-selling method for over five and a half years, although Mutual claims that its needs-based method was different than the one Bozue used before she worked at Mutual.  *Id.*; Wilke Dep. 23:16–24:9.  Bozue had approximately 21 years of experience training employees and supervisors on company policies and systems from her tenure in human resources.  Doc. 48-16 at ¶ 13.  Meanwhile, Corpas had only five and a half years of experience training other agents over his career.  Doc. 48-17.

### E.    Mutual's reasons for its decision

Mutual states that the four decisionmakers, Cochran, Skar, Healey, and Wilke, believed Corpas was the best candidate for the General Manager position.  Doc. 43 at ¶ 9.  Mutual asserts that after the candidates met the minimum qualifications for the position and passed the pre-screening, the decisionmakers based their decision on the candidates' background, experiences, interview answers, and presentations.  *Id.*  The four decisionmakers testified that Corpas performed the best after giving the presentations and answering questions in the interviews, and that they liked his experience with holistic needs-based-relationship selling, his community involvement, his communication skills, the use of "trustworthy selling" and understanding the specific sales methodology that Mutual of Omaha was attempting to use, his energy and positive attitude, and his many years of experience in the industry being a trainer and agency manager. Cochran Dep. 183:2–184:25, 187:10–189:1, 191:3–192:5, *et seq.*; Healey Dep. 67:17–68:25, 71:14–71:20, 100:17–101:25, *et seq.*; Skar Dep. 79:25–80:10, 80:21-81:15, 88:25–90:2, *et seq.*, Wilke Dep. 106:6–106:11, 106:16–106:19, 108:12–109:9, *et seq.*; Doc. 43-1 at ¶ 2.

Bozue contests Mutual's explanation, noting that Cochran gave her a different reason during their meeting:  Mutual chose a candidate with "more experience building bigger teams." Bozue Dep. 151:15–152:23.  Bozue asserts that Corpas does not have "more experience building bigger teams," as she recruited over 50 agents over her career, compared to his 18.  Doc. 48 at ¶ 22-24.

Bozue also points to Cochran's account that Bozue "scored the highest on the presentation," to rebut Mutual's claim that Corpas performed best in the presentations and interviews.  Bozue Dep. 151:15–152:23.

### F.      Gender makeup in the General Manager position

Bozue presents evidence that Mutual rarely selected women to work as General Managers.  At the time of Bozue's application to the General Manager position, all of Mutual's approximately 30 General Managers were male.  Wilke Dep. 234:24–235:6; Cochran Dep. 50:18–24.  Wilke testified in her deposition that she was not aware of any female General Managers before 2017, at least since 2009.  Wilke Dep. 234:24–235:6.  Skar testified that he remembered several female General Managers from earlier in his career at Mutual, but he was unaware of any woman holding the role from 2000-2017.  Skar Dep. 75:3–19.

Additionally, Cochran acknowledged that Mutual has an overall underrepresentation of women in the General Manager and General Sales Manager positions and that it is "an industry dominated by men." Cochran Dep. 252:3–25.

### G.      Other women applying to General Manager positions at Mutual

Bozue presents evidence of two other female candidates, Sheri Sisler Moore and Kristi Acree, who applied for General Manager positions at Mutual less than seven months after Mutual decided not to promote Bozue.  Bozue claims that Mutual chose two less-qualified male candidates from outside the company over these more-qualified female employees.  Moore Dep. 7:18–8:16; Wilke Dep. 192:5–14, 212:16–19, and 216:16–25; Doc. 48-27; Doc. 48-28; Doc. 48-29; Doc. 48-30.  The same three Mutual executives participate in each General Manager selection decision: Healey, Skar, and Wilke.  Doc. 48-3; Cochran Dep. 57:3–6, 58:20–23, and 158:12–24.  And the General Manager hiring and selection process that Mutual used for Moore and Acree's applications was identical to that used for Bozue.  Wilke Dep. 192:5–14, 212:16–19, and 216:16–25.

12

Sheri Sisler Moore worked for Mutual as a General Sales Manager from 2010 to 2017. Moore Dep. 7:18–8:16 and 12:16–20; Doc. 48-29.  In October 2017, Moore applied for the General Manager position for her division in Florida.  Moore Dep. 7:18–8:16 and 12:16–20. Moore had worked for Mutual as an interim General Manager for almost four years when she applied, growing her team to 40 agents.  Moore Dep. 37:3–10 and 41:19–22.  Moore also received numerous awards from Mutual, such as the Field Management Award for top managers in 2010, 2011, 2012, 2015, and 2016.  Doc. 48-29; Wilke Dep. 18:10–21 and 61:5–62:1.

Moore had worked in the insurance industry for thirty years, aside from a 5-year period in the early 2000s when she worked in marketing. Moore Dep. 11:6–21 and 78:18–79:20; Doc. 48-29.  Moore held a management role since the early 1990s.  *Id.*  She used a needs-based-selling method since 2003 and trained her agents to do the same.  Moore Dep. 22:15–23:6.  Moore Dep. 11:6–21, 78:18–79:20; Doc. 48-29.

Mutual hired Rob Liebman, a man from outside the company, instead of Moore.  Wilke Dep. 192:5–14; Doc. 48-30.  During his career, the largest team Liebman built and managed consisted of 26 agents.  *Id.*  Bozue points out that Liebman's resume contains no mention of needs-based selling or use of the "trustworthy selling" method.  Doc. 48-30.  Moore had built bigger teams than Liebman and run more branches at a time.  *Id.*; Moore Dep. 22:13–23:6.

Moore sat for a deposition, where she shared about her experience and the circumstances of her application for general manager.  Moore did not testify that she believed Mutual discriminated against her because of her sex, however, nor did she file a complaint of sex discrimination at any time.  Moore Dep. 80:2–12, 23–25.

Kristi Acree worked for Mutual as an Agency Operations Manager in its Blue Bell, Pennsylvania office.  Wilke Dep. 212:7–2; 216:8–11.  When Acree applied for the General Manager position in 2018, Mutual gave the job to an outside hire, Jeremy Priar.  *Id.*

At the time of her application, Acree assisted the current General Manager in running the Division.  Wilke Dep. 213:3 – 18; Doc. 48-7.  She had worked at Mutual for 15 years and in a management role for seven years.  *Id.*  As an Agency Operations Manager, Acree helped grow her Division's agents from 25 to 150, making it the number one division in the country from 2010–2015. *Id.*

Priar had significantly less relevant experience.  Priar had just 5 years total experience in the insurance industry, with two years as a business development director and three years as an insurance agent.  Skar Dep. 231:4 – 232:13; Doc. 48-28.  Unlike Acree, Priar had little management experience in the insurance industry, and no experience in agency management or agency training.  *Id.*

Notably, Acree did not sit for a deposition for this case, nor did she testify that she believed Mutual discriminated against her.  And soon after Mutual denied Acree the promotion at the Blue Bell Division, Mutual actually promoted Acree to General Manager in Mutual's Boston office.  Wilke Dep. 233:7–234:3.

## II.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from

14

the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts."  *Id.* at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249–50 (citations omitted).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   Discussion

Mutual moves for summary judgment on Bozue's claims, arguing first that Bozue's failure-to-promote claim under the MHRA is time-barred.  Mutual argues second that Bozue failed to show that its legitimate, non-discriminatory reasons for promoting Corpas were a pretext for sex discrimination under the burden-shifting framework set forth in *McDonnell*

15

*Douglas Corp v. Green*, 411 U.S. 792 (1973).  Finally, Mutual argues that Bozue cannot avoid summary judgment on her constructive discharge claim, as her working conditions were not objectively intolerable and Mutual did not intend or reasonably foresee that Bozue would have to resign.

### A.    MHRA statute of limitations

Mutual asserts that Bozue's failure-to-promote claim under the MHRA is time-barred because Bozue filed her charge more than 180 days after Mutual informed her that she did not receive the promotion.  Bozue urges that her claim is still timely due to the "continuing violation" doctrine, because Mutual's failure to promote her was part of a pattern of discrimination that continued until her constructive discharge only 76 days before she filed her charge.

The Missouri Human Rights Act requires plaintiffs claiming unlawful discrimination to exhaust their administrative remedies before coming to court. *See* §§ 213.075, 213.111(1).  To exhaust their administrative remedies, plaintiffs must file an MHRA charge with the Missouri Commission on Human Rights within 180 days of the alleged unlawful employment practice and then receive a right-to-sue letter.  § 213.075.  A plaintiff's failure to file a charge within the MHRA's statute of limitations may result in the dismissal of their claim.  § 213.075 ("The failure to timely file a complaint with the commission may be raised as a complete defense by a respondent or defendant . . . in subsequent litigation."); *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 835 (8th Cir. 2002) (MHRA claim properly dismissed because charge not filed within statutory filing period).

The "continuing violation" doctrine is an equitable exception to the MHRA's statute of limitations, permitting plaintiffs to advance claims for discrimination that occurred prior to the

statutory period if they can show that the discrimination continued within the statutory period. *See Rowe v. Hussmann Corp.*, 381 F.3d 775, 782 (8th Cir. 2004) (citing *Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (Mo.Ct.App.1999). But equitable doctrines like the continuing violation "are to be applied sparingly" in determining if a charge is timely. *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 (Mo. Ct. App. 2012) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Missouri courts apply a two-part test to determine if a plaintiff has shown a continuing violation. *Rowe*, 381 F.3d at 782. The plaintiff "must first demonstrate that at least one act occurred within the filing period and, second, must show that the harassment is a series of interrelated events, rather than isolated or sporadic acts of discrimination." *Id.* (internal citations omitted). To be part of a continuing violation, the discriminatory acts must be "sufficiently related to form a single practice" that continued into filing period. *Id.*

Federal interpretations of Title VII are applicable to the MHRA, particularly in the context of the continuing violation doctrine. *Gillespie v. Charter Commc'ns*, 31 F. Supp. 3d 1030, 1033 n.4 (E.D. Mo. 2014) ("For purposes of continuing violations, interpretations of Title VII also apply to claims under the MHRA.") (citing *Rowe*, 381 F.3d at 782); *see also Tisch*, 368 S.W.3d at 252 ("When reviewing cases under the MHRA, we are guided by both Missouri law and any federal employment discrimination (i.e., Title VII) case law that is consistent with Missouri law."). Addressing continuing violations in the context of Title VII, the Supreme Court held that discrete actions by an employer, such as termination, failure-to-promote, denial-of-transfer, and refusal-to-hire, are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 114, *superseded in part on other grounds by statute,* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5. For failure-to-

promote claims, the Supreme Court held that each discriminatory event "starts a new clock for purposes of filing charges related to that act, and an employee must file charges within 180 days . . . of a discrete discriminatory action." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 987-88 (8th Cir. 2003) (interpreting continuing violation doctrine under Title VII) (citing *Morgan*, 536 U.S. at 114-15).

Here, Bozue filed her charge of discrimination on April 27, 2018.  Bozue's charge was timely with respect to her asserted constructive discharge on February 9, 2018.  But Mutual denied Bozue's promotion in August 2017, so her failure-to-promote claim does not fall within the 180-day filing period.  The continuing violation doctrine does not save her claim, however. Mutual's denying Bozue's promotion constituted a "discrete act," rather than part of a "series of interrelated events," because the promotion decision was a single decision by Mutual.  *See Tisch*, 368 S.W.3d at 255 (holding that the continuing violation theory does not save untimely discrete acts including failure-to-promote under the MHRA, because "[a] continuing violation is established when the plaintiff shows a series of closely-related, similar events that occurred within the same general time period and stemmed from the same source that continued into the limitations period."); *Williams v. Lender Processing Servs., Inc.*, 2013 WL 5739059, at *1 (E.D. Mo. 2013) (dismissing untimely claims under the MHRA for failure-to-train, failure-to-promote, constructive demotion, and failure-to-approve a pay raise because each claim involved discrete acts of discrimination rather than a continuing violation); *Gillespie*, 31 F. Supp. at 1034 (dismissing untimely claim under the MHRA for failure-to-promote because the plaintiff alleged a series of discrete discriminatory events rather than a continuing violation).

Bozue raises *Plengemeier v. Thermadyne Indus.*, 409 S.W.3d 395 (Mo. Ct. App. 2013), arguing that Missouri state courts have sometimes applied the continuing violation doctrine to

failure-to-promote claims.  But *Plengemeier* did not alter the settled principle that discrete events cannot form the basis for a continuing violation.  *Id.* at 401.  *Plengemeier* confirmed that continuing violations consist of "'repeated conduct' extending over a period of time." 409 S.W.3d at 403 (quoting *Tisch*, 368 S.W.3d at 254).

In *Plengemeier*, the Missouri Court of Appeals found that the plaintiff sufficiently alleged a series of interrelated events to survive a motion to dismiss.  *Id.* at 403.  The court relied on the fact that plaintiff's employer had repeatedly chosen to pay her less than a man and give her less benefits on an annual basis.  *Id.* at 401-2.  The employer's discriminatory pay practice continued through the statutory filing period.  *Id.* at 401.  The court held that the plaintiff's petition, which included untimely allegations of not receiving promotions, survived dismissal because the alleged pay practice "was not an isolated incident, but occurred from 2006 through 2010, and consisted of a pattern or practice in the midst of which [plaintiff] alleges [defendants] passed her over and did not even interview or consider her for a promotion for which she was better qualified than the ultimate [male] recipient [], simply because she is female."  *Id.* at 403.

Bozue's claim is unlike the plaintiff's in *Plengemeier*.  Bozue does not show a pattern of "interrelated events" involving "repeated conduct" that would connect Mutual's promotion decision to a discriminatory act within the statutory period.  *See id.* at 403.  Bozue argues that she suffered a series of discriminatory acts while working for Mutual, pointing to several instances of unequal treatment that occurred before the promotion decision as well as her constructive discharge claim afterwards.  Yet these events are not "interrelated" like the pay and promotion decisions alleged in *Plengemeier*, because they did not occur at the same time, nor did they involve the same subject matter or decisionmaker.  *See Cooper v. KSHB-TV 41*, 2018 WL 8131234, *5 (W.D. Mo. 2018) ("These promotion denials are not a continuous or otherwise

connected chain of events like the annual review of the plaintiff's pay alleged in *Plengemeier* . . . The other actions [p]laintiff relies upon (the failure to select her as a Leadership Champion and work assignments in the urban core) also lack a connection to any events within the relevant time period."). Further, Mutual's denial of promotion to Bozue was not "repeated conduct," as Mutual denied her the promotion only once. *Plengemeier*, 409 S.W.3d at 403.

This case is not comparable to *Plengemeier* and does not involve a continuous violation. The Court finds that Bozue cannot pursue her failure-to-promote claim under the MHRA.

### B.   Title VII failure-to-promote

Title VII makes it unlawful for an employer to discriminate against an employee because of her sex in the terms and conditions of her employment, including promotions. 42 U.S.C. § 2000e-2(a)(1). Bozue can survive summary judgment on her Title VII failure-to-promote claim in two ways. She may either "present admissible evidence directly indicating unlawful discrimination," or alternatively, she can create "an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp.*" *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009)). As Bozue presents no direct evidence of discrimination showing "a specific link between the alleged discriminatory animus and the challenged decision," *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004), she must support her claims under the *McDonnell Douglas* proof framework. *Gibson*, 670 F.3d at 853.

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of intentional discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. Then, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant meets this burden, then the burden shifts back to the plaintiff to

produce sufficient admissible evidence that creates a genuine issue of material fact regarding whether defendant's proffered nondiscriminatory justification is merely pretextual for intentional discrimination. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011).

Mutual met its burden of production by offering legitimate, non-discriminatory reasons for choosing a different candidate over Bozue for promotion. Mutual states that the four decisionmakers believed Corpas was the best candidate for the General Manager position of the four final candidates. The decisionmakers liked Corpas's presentation and his interview answers, as well as his experience with holistic needs-based-relationship selling, his community involvement, his communication skills, the use of "trustworthy selling" and understanding the specific sales methodology that Mutual was attempting to use, his energy and positive attitude, and his many years of experience in the industry as a trainer and agency manager.

Because Mutual offered legitimate, non-discriminatory reasons for denying her the promotion, Bozue bears the burden "to produce sufficient admissible evidence that creates a genuine issue of material fact regarding whether [Mutual's] proffered nondiscriminatory justification is merely pretextual for intentional discrimination." *Pribyl v. Cty. of Wright*, 964 F.3d 793, 796 (8th Cir. 2020). At this stage, "[m]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the employer's] legitimate, non-discriminatory explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006).

Bozue claims that the evidence she presented creates a genuine issue of material fact as to whether Mutual's reasons for denying her the General Manager position were pretextual. Bozue's evidence takes several forms, which the Court will evaluate in turn.

### 1.       Qualifications

Bozue asserts that she "was substantially better suited" to be a General Manager than Corpas.  Companies generally "pick the best qualified candidate for promotion. When that is not done, a reasonable inference arises that the employment decision was based on something other than the relative qualifications of the applicants."  *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir. 1998).  Evidence of an applicant's qualifications can support a finding of pretext, but only if a plaintiff can "show that [the employer] hired a *less* qualified applicant."  *Torgerson*, 643 F.3d at 1049.

Bozue presents evidence to show she was objectively more qualified for the position than Corpas.  First, Bozue had more years of management experience, in and out of the insurance industry.  Bozue had 17 years of management experience in total, compared to Corpas's seven years.  In the insurance industry, Bozue had five and a half years of management, compared to Corpas's four years.  Two of Mutual's decisionmakers, Healey and Cochran, admitted in their depositions that Bozue had more management experience than Corpas.

Second, Bozue had recruited and supervised more insurance agents in her career.  Before she worked at Mutual, Bozue had recruited 12 agents.  And during her three and a half years working at Mutual, Bozue recruited 39 more agents, bringing her total to 51 agents.  Corpas recruited only 18 agents over his career.  Both Bozue and Corpas supervised around 21 agents at a time over their careers, but while Bozue supervised agents who worked solely for commission, Corpas's agents received a base salary in addition to commission.

Third, Bozue had more training experience than Corpas.  Bozue trained insurance agents in need-based selling methods for over five and a half years and had a total of 21 years of

experience training both employees and supervisors due to her human resources background. Corpas had only five and a half years of experience training other agents over his career.

Fourth, Bozue had a strong track record as a General Sales Manager and a deep knowledge of Mutual's policies and systems.  Wilke confirmed that the General Sales Manager and General Manager positions had a significant amount of overlap in job duties and skills:  both positions required a strong "needs-based selling" strategy, strong skills for fostering and developing agents, strong agent recruiting and training skills, and in-depth knowledge of Mutual's products.  Bozue received numerous sales management awards and positive performance reviews as a General Sales Manager.  She received praise in her performance reviews for her work training agents in Mutual's "needs-based selling" strategy and developing her agents.  She had a reputation for building strong relationships with her agents and for helping them resolve issues.  As the internal candidate, Bozue also had more knowledge and experience with Mutual's products and systems.  Cochran acknowledged as much, agreeing that Bozue had a better understanding of Mutual's policies and systems than Corpas, as well as more robust relationships with Mutual's agents.  Cochran even told Bozue to "take over things" and "handle" the Gateway Division for him when the General Manager position was vacant for several months in 2017.

Mutual claims it did not make the hiring decision based solely on Bozue's objective criteria.  Rather, once the four candidates met the minimum qualifications for the position and passed the pre-screening, the decisionmakers chose a candidate based on what "they believed would be the best fit based on [the candidate's] background, experiences, interview answers, and presentations."  For example, one reason the decisionmakers gave for their decision was that

23

Corpas performed the best after giving the presentations and answering questions in the interviews.

Employers may use subjective factors in their hiring decisions, and the use of subjective factors does not itself create an inference of discrimination. *See, e.g., Torgerson*, 643 F.3d at 1049 ("Where the employer does not rely exclusively on subjective criteria, but also on objective criteria and education, the use of subjective considerations does not give rise to an inference of discrimination."); *Wingate v. Gage Cty. Sch. Dist.*, No. 34, 528 F.3d 1074, 1080 (8th Cir. 2008) (same); *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 705 (8th Cir. 2012) (where employer uses objective criteria such as job history as part of promotion decision, the use of subjective considerations does not give rise to an inference of discrimination). "Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007).

The Eighth Circuit's recent decision in *Pribyl* informs the Court here. 964 F.3d at 796–97 (affirming summary judgment on failure-to-promote claim where employer used objective criteria to determine if candidates met minimum job requirements and then subjectively compared candidates' interview performance). In *Pribyl*, the plaintiff attempted to establish pretext through evidence that she was objectively more qualified than the chosen candidate. *Id.* at 797. The court held that even if the plaintiff was the most objectively qualified candidate, the employer was entitled to consider subjective factors like interview performances in its decision, so the plaintiff's evidence of superior objective qualifications did not establish pretext. *Id.* ("Regardless of how well Pribyl perceived her own interview performance, it is the panelists'

24

impressions that matter."); *see also Torgerson*, 643 F.3d at 1050 ("[Plaintiffs'] own opinions that they should have received higher interview scores are simply irrelevant as it is the employer's perception that is relevant, not the applicants' subjective evaluation of their own relative performance.").

Just like the employer in *Pribyl*, Mutual used objective criteria to determine if the candidates met the minimum qualifications for the position, and then utilized more subjective factors to determine the best fit for the job, including Bozue's interview performance.  The decisionmakers' uncontroverted testimony and interview notes support the veracity of Mutual's proffered reasons for selecting Corpas, and Bozue points to no evidence that these subjective factors are a cover for discrimination.  Even if the Court assumed that Bozue was objectively more qualified for the position, this Court will not second-guess Mutual's selection process or criteria.  *See Wingate*, 528 F.3d at 1080; *Manse v. Union Elec. Co.*, 961 F. Supp. 1296, 1302 (E.D. Mo. 1997) (granting summary judgment for employer where plaintiff took issue with employer's criteria, holding that employer's considerations "are business judgments that are not within the province of this Court to second-guess.").  Therefore, Bozue cannot establish pretext based on her qualifications.

### 2.      Change in proffered reasons

Bozue also claims that Mutual changed its story about why it chose Corpas for the General Manager position.  Cochran allegedly told her that the person who got the position had more experience "building bigger teams" but that Bozue still scored the highest on her presentation.  In his deposition, Cochran denied saying these things to Bozue.

Inconsistent explanations by an employer can be evidence of pretext, but even if Cochran told Bozue that the chosen candidate had "more experience building bigger teams," that

25

statement does not, by itself, support a finding of pretext. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005) ("While it is true that [s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason." (internal quotations omitted)).  Each of the individual decisionmakers testified to different aspects they preferred about Corpas's candidacy.  Simply because Cochran did not tell Bozue all of the reasons why he or the other decisionmakers favored Corpas does not establish pretext, especially when Corpas's prior experience in the industry as a trainer and agency manager played a role in Mutual's decision. *See Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 835 (8th Cir. 2002) (holding that the plaintiff failed to show pretext through evidence of inconsistent reasons for the decision when the employer "did not back off from the original explanation").  Additionally, Cochran's consolation to Bozue that she scored the highest on the presentations is not evidence of pretext, since Mutual does not claim that it hired Corpas because he had the highest score on the presentations.  Bozue therefore cannot use Cochran's alleged statements to establish pretext, because Mutual did not change its reasons for hiring Corpas.

### 3.   Other female applicants for General Manager positions

Bozue purports to show that Mutual discriminated against two other women who applied for General Manager positions, Moore and Acree.  Mutual argues that this evidence is not probative of whether its non-discriminatory reasons were pretextual. *See McPheeters v. Black & Veatch Corp.*, 427 F.3d 1095, 1101 (8th Cir. 2005) (affirming exclusion of evidence of other employees' complaints of discrimination as "overly broad" and "not specifically relevant" to plaintiff's claims); *Kline v. City of Kansas City, Mo.*, 175 F.3d 660, 668 (8th Cir. 1999) (affirming exclusion of evidence of alleged discrimination as irrelevant); *Schrand v. Fed. Pacific*

*Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988) (testimony from the plaintiff's former co-workers alleging discrimination against themselves should have been excluded as irrelevant or unfairly prejudicial); *Haskell v. Kaman Corp.*, 743 F.2d 113, 122 (2d Cir. 1984) (testimony regarding other alleged instances of discrimination "definitely should have been excluded" at trial and admission of such testimony constituted reversible error).

Bozue raises *Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 424-25 (8th Cir. 2017), a wage discrimination case where the Eighth Circuit affirmed the admission of evidence at trial that other female employees were paid less than male employees. The *Dindinger* court explained that "[w]e have previously held that me-too evidence 'should normally be freely admitted at trial' because 'an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination.'" 853 F.3d at 424 (quoting *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155–56 (8th Cir. 1990)).

Rather than applying a per se rule excluding evidence of similar discriminatory acts by employers, courts must make a case-specific determination of relevance and prejudice under Rules 401 and 403 of the Federal Rules of Evidence. *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 387–88 (2008). The admissibility of the evidence depends on "the context of the facts and arguments in a particular case," including "how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* The Court must first examine the context of Bozue's evidence and how closely related her evidence is to the facts and arguments at issue here. *See Combs v. Cordish Companies, Inc.*, 2018 WL 1464033, at *8 (W.D. Mo. 2018).

Here, Moore's and Acree's applications for the General Manager positions are relevant to Bozue's case due to their many factual similarities.  *See* Fed. R. Evid. 401.  Moore and Acree both applied for General Manager positions at Mutual shortly after Bozue, and the hiring process and decisionmakers involved in the decisions were almost identical.  Moore and Acree also hold similar qualifications as Bozue, but Mutual selected male candidates from outside the company for promotion instead.  And while Bozue's presentation of this evidence may present a risk of prejudice or confusion of the issues under Rule 403, the Court finds that for purposes of summary judgment, the risks do not substantially outweigh the probative value of the evidence.  Thus, the Court assumes that Bozue's evidence would be admissible at trial.

Though evidence from Moore's and Acree's applications may be admissible under Rule 401 and 403, this evidence by itself does not support a reasonable inference of discrimination in Mutual's promotion decisions.  Bozue presents no evidence that the decisionmakers made any discriminatory comments or actions against Moore or Acree at any time before or after the promotion decisions.  Mutual provided legitimate, non-discriminatory reasons why it chose not to promote Moore and Acree, and those reasons varied depending on the candidate and position in question.

Mutual chose Liebman over Moore because of Liebman's "experience level and performance in the selection process."  Wilke Dep. 211:8–211:24.  According to Wilke, Liebman "had been with a more sophisticated group of firms and built larger practices over his career" and gave better answers than Moore's during their interviews.  *Id.*  Mutual chose Priar over Acree because of his superior recruiting philosophy and because the promotion "wasn't the best opportunity for Kristi as a managing director" due to substantial changes in the Blue Bell Division at the time.  Wilke Dep. 225:12–225:16, 234:4–234:17.  Wilke stated that there was

"disruption in that territory" due to a mass exodus of staff and that people would not receive her well because they "associated her with the former manager" of the division, who was not well-liked and did not have a good reputation in the community.  Wilke Dep. 226:3–227:5, 235:7–235:24.  And soon after Mutual denied Acree the promotion at the Blue Bell Division, Mutual promoted Acree to General Manager in Mutual's Boston office.  Wilke Dep. 233:7–234:3.

As the Court already discussed with regard to Bozue, evidence of a candidate's allegedly superior objective qualifications does not create an inference of discrimination when the employer considered alternative factors.  *See, e.g., Torgerson*, 643 F.3d at 1049; *Wingate*, 528 F.3d at 1080; *Hunter*, 697 F.3d at 705; *Pribyl*, 964 F.3d at 796–97.  Though Bozue emphasizes the ways that Moore's and Acree's qualifications are superior than Liebman's and Priar's, Bozue does not rebut any of the subjective factors, such as interview performance or personal fit with the position in question, that Mutual considered with regard to those promotion decisions.  *See Pribyl*, 964 F.3d at 797 (employers are entitled to consider subjective factors such as interview performance).

Moreover, while Bozue paints Moore and Acree as comparable examples of discrimination, the summary judgment record shows that neither woman testified that she believed Mutual discriminated against them because of her sex and neither woman filed a complaint of sex discrimination against Mutual.  Thus, the probative value of Moore's and Acree's applications rests entirely on Bozue's own perception that they were victims of sex discrimination.  And even though Mutual denied Acree the initial promotion, Mutual later promoted Acree to General Manager in a different office, which further weakens Bozue's argument for a pattern of discrimination in this position.  Bozue's conclusion that Mutual

discriminated against Moore and Acree is not supported by the evidence in the record, including the fact that Moore and Acree themselves did not claim that Mutual discriminated against them.

Though plaintiffs may use an employer's past discriminatory practices as circumstantial evidence of pretext, "[t]he evidence, however, must assist in the development of a reasonable inference of discrimination within the context of each case's respective facts." *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1419 (8th Cir. 1995). The Court finds that the evidence from Moore and Acree's applications provides insufficient support for an inference of pretext.

### 4. Gender makeup in the General Manager position

Bozue next draws attention to Mutual's approximately thirty General Managers, which were all male as of 2017. But standing alone, the gender makeup of the workforce cannot establish that Mutual's proffered reasons for its decision are pretextual. *See Cox v. First Nat. Bank*, 792 F.3d 936, 941 (8th Cir. 2015) (the fact that one out of the employer's 15 executive officers, and one of the 12 board members, is female was not enough to discredit the employer's hiring criteria, even where such criteria was subjective). Bozue presents no statistical evidence showing how many women applied to be General Managers or how many women were qualified for the job. *Schultz v. McDonnell Douglas Corp.*, 105 F.3d 1258, 1259 (8th Cir. 1997) "[S]tatistics must evaluate comparable employees to be meaningful indicators of pretext."). While relevant in conjunction with other evidence of pretext, Bozue's evidence does not create an issue of material fact as to whether Mutual's stated reasons were pretextual. *See Cox*, 792 F.3d at 941.

### 5. Other evidence of discrimination

Bozue raises several other instances of unequal treatment at the hands of her supervisors, but these events do not establish pretext, as they had nothing to do with her application to the

General Manager position.  First, Bozue brings up Mutual's changing standards when she tried to become a General Sales Manager in 2013.  Yet aside from her claim that her supervisor said the directive came from "upper management," Bozue has no evidence to connect this event with the General Manager promotion decision in 2017.

Second, Bozue points to unfair staff assignments and hurtful comments from her previous supervisor, Marshall, as well as from her new supervisor, Corpas.  But neither of these managers were involved in the hiring decision at issue here.  While unequal treatment and demeaning comments can be evidence of an employer's discriminatory mindset, actions and statements from a non-decisionmaker fall short of establishing pretext when they could not have influenced the decision.  *Wittenburg v. Am. Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 837 (8th Cir. 2006); *see also Girten v. McRentals, Inc.*, 337 F.3d 979, 983 (8th Cir. 2003).

Third, Bozue alludes to Mutual's lack of an investigation when she asked Cochran if any part of the hiring decision "had to do with me being female?"  and stated that Mutual was a "good old boys club."  This evidence also fails to show that Mutual's stated reasons were pretextual.  Bozue's comments were not made in the context of a human resources complaint.  Cochran's failure to follow up with Bozue about her comments was not retaliatory, nor was his inaction related in any way to Mutual's reasons for the hiring decision.

### 6.    Conclusion on Bozue's failure-to-promote claim

The Court finds that Bozue does not raise a genuine dispute of material fact that Mutual's reasons for promoting Corpas are pretextual, or "unworthy of credence."  The only viable evidence in Bozue's favor is Mutual's general lack of female General Managers in 2017 and Mutual's denial of promotion to Moore and Acree.  But this evidence does not help establish Bozue's particular claim of discrimination and cannot create a reasonable inference that Mutual's

reasons for not promoting Bozue were pretextual.  *See Jones*, 461 F.3d at 992 ("[M]ore

substantial evidence of discrimination is required to prove pretext, because evidence of pretext is

viewed in the light of [the employer's] legitimate, non-discriminatory explanation.").  Evidence

of Bozue's qualifications, Cochran's initial explanation for the decision, and the other evidence

from Bozue's tenure at Mutual, even taken as a whole, does not create a genuine issue of

material fact on whether Mutual's legitimate, non-discriminatory reasons were pretextual.

Mutual is entitled to summary judgment on Bozue's Title VII failure-to-promote claim.

### C.    Constructive discharge under Title VII and the MHRA

Bozue claims that she suffered a constructive discharge based on the "totality of the

circumstances" of her treatment as an employee at Mutual.  She felt that Mutual created

intolerable working conditions by initially preventing her from becoming a General Sales

Manager, assigning inferior staff to her once she attained the position, subjecting her to belittling

statements by her supervisors, denying her a promotion, refusing to promote other qualified

women, and ignoring her complaint of sex discrimination.

Mutual contends that Bozue did not prove facts sufficient to permit a jury to find that she

was constructively discharged, as her working conditions were not objectively intolerable and

Mutual did not intend or reasonably foresee that Bozue would resign.  To establish a constructive

discharge claim under Title VII and the MHRA, Bozue must show that: (1) a reasonable person

in the employee's situation would have found the working conditions intolerable; and (2) the

employer intended to force the employee to quit, or the employer could reasonably foresee that

its actions would cause the employee to quit.  *Davis. v. KARK-TV, Inc.*, 421 F.3d 699, 706 (8th

Cir. 2005); *Gamber v. Mo. Dep't of Health and Senior Servs.*, 225 S.W.3d 470, 477 (Mo. Ct.

App. 2007) (Missouri courts apply the same test for constructive discharge as the Eighth Circuit).

Bozue does not attempt to show that Mutual purposefully forced her to quit, so her constructive discharge claim can only avoid summary judgment if there is evidence for a reasonable jury to find: (1) a reasonable person in her situation would have found the working conditions intolerable; and (2) Mutual could reasonably foresee that its actions would cause her to quit. *See id.*

### 1.      Objectively intolerable working conditions

To establish the first element of her constructive discharge claim, Bozue must present evidence of intolerable working conditions, "judged by an objective standard, not the employee's subjective feelings." *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000).  The primary question is "whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative." *Tatom*, 228 F.3d at 932.  In *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841-42 (8th Cir. 1998), the Eighth Circuit discussed several cases defining the types of conditions that render a workplace intolerable for constructive discharge claims.  *Howard* explained that in *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 497 (8th Cir. 1996), "an employee who worked in an environment that was 'tinged with discriminatory acts' was nevertheless not constructively discharged, because the acts were not so severe that a reasonable person would have found them intolerable." *Howard*, 149 F.3d at 841–42.  Similarly, evidence of a supervisor scrutinizing an employee's work more closely than her peers' was also not an intolerable working condition.  *Id.* at 842 (discussing *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 575 (8th Cir. 1997)).  Objectively intolerable conditions include circumstances where an employee's supervisor used racial slurs and sometimes directed them at an employee, *Delph v. Dr. Pepper Bottling Co.*, 130

F.3d 349, 356 (8th Cir. 1997), but not "frustration and embarrassment at not being promoted,"
*Tidwell*, 93 F.3d at 495.

Bozue does not provide evidence of objectively intolerable working conditions.  Her
evidence that her supervisors held her to different standards than her male coworkers and
assigned her inferior staff is insufficient, as even an environment "tinged with discriminatory
acts" does not create a constructive discharge.  *Id.* at 497.  Bozue submits evidence that her direct
supervisors, Marshall and Corpas, both criticized her work or belittled her achievements on
occasion, but this evidence also does not create objectively intolerable working conditions.
*Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159-60 (8th Cir. 1999), *abrogated in*
*part on other grounds by Torgerson*, 643 F.3d at 1031, (employee's feeling of being unfairly
criticized is not so intolerable to a reasonable person to support a constructive discharge claim).
Mutual's lack of women in leadership and its denial of her promotion was also not so
objectionable that resignation was the "only plausible alternative."  *Tatom*, 228 F.3d at 932; *see*
*also Tidwell*, 93 F.3d at 495.

Bozue claims that the absence of "realistic prospect[s] of advancement and career growth
with her employer" can form objectively intolerable working conditions, but the cases she cites
do not adequately support her argument.  To start, Bozue's only authorities in the Eighth Circuit,
*MacGregor v. Mallinckrodt, Inc.*, 2003 WL 23335194 (D. Minn. 2003) and *Newell v. Speer*,
2017 WL 4838303 (D.S.D. 2017), do not hold that a lack of career prospects in employment can
establish a constructive discharge claim.

*MacGregor* was not a constructive discharge case.  *MacGregor* dealt with an employer's
motion for a new trial when the trial court instructed the jury on "a smorgasboard of adverse
actions from which to find liability, including discharge; constructive discharge; cuts in pay or

benefits; changes that affect future career prospects . . . and transfer to a position affording fewer opportunities for salary increases or advancement."  2003 WL 23335194, at *16.  The court denied the employer's motion, finding that because of the presence of disputed facts between the parties, the court properly instructed the jury on both direct and constructive discharge, as well as adverse employment actions.  *Id.* at *16–17.  But on appeal, the Eighth Circuit pointed out that the plaintiff "presented only one claim: gender discrimination. She did not present evidence of a constructive discharge . . . there is no confusion as to which adverse action the jury used to find liability." *MacGregor v. Mallinckrodt*, Inc., 373 F.3d 923, 928 (8th Cir. 2004).

*Newell* does not support Bozue's claim either.  *Newell* acknowledged that "a 'change in employment that significantly affect[s] an employee's future career prospects' may amount to an adverse employment action," but that alone did not constitute a constructive discharge.  2017 WL 4838303, *12 (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005)).  The plaintiff in *Newell* claimed that for over a decade, he suffered a racially hostile work environment consisting of a "good old boy" environment, use of racial epithets, and supervisors misusing their power to impact his employment.  *Id.* at *6–8.  But the court entered summary judgment against the plaintiff on his constructive discharge claim.  *Id.* at *12 ("His constructive discharge claim is premised on the same allegations that are insufficient as a matter of law to establish his hostile work environment claim.").

Bozue's cases from outside the Eighth Circuit fare little better.  In *Hopkins v. Price Waterhouse*, 825 F.2d 458, 472 (D.C. Cir. 1987), *reversed on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the D.C. Circuit reasoned that "the intolerableness of working conditions is very much a function of the reasonable expectations of the employee, including expectations of promotion or advancement."  The court held that "the mere fact of

discrimination, without more, is insufficient to make out a claim of constructive discharge" but also determined that "Price Waterhouse's decision to deny Hopkins partnership status, [] coupled with the OGS's failure to renominate her, would have been viewed by any reasonable senior manager in her position as a career-ending action." *See id.* at 473. But Bozue's circumstances are distinguishable, however, because they did not rise to the same level of severity as the plaintiff's in *Hopkins*. *See id.* The "customary and nearly unanimous practice" at Price Waterhouse was "for senior managers who have been passed over for partnership to resign, and one of the [] partners [in her office] who strongly opposed Hopkins' candidacy advised her to do just that." *Id.* at 472. The plaintiff in *Hopkins* also supported her constructive discharge claim with strong evidence of discriminatory animus, including comments from multiple partners that said she was "brusque, abrasive, masculine, and overly aggressive" and that she came across as "macho" and needed to take a "course at charm school." *Id.* at 463, 473. Many of these comments arose during her candidacy for partnership. *Id.* at 463. Unlike the employer in *Hopkins*, Mutual did not expect Bozue to resign after she did not receive the promotion, and no one asked her to leave because of it. And Bozue did not present similar evidence of discriminatory animus in the hiring process or hostility to her because of her sex. Even if the Court decided to follow *Hopkins*, Bozue's failure to get the General Manager position on her first try did not create objectively intolerable working conditions.

*Thomas v. Cooper Indus., Inc.*, 627 F. Supp. 655 (W.D.N.C. 1986), also does not support her argument. In *Thomas*, the North Carolina district court found that the plaintiff's working conditions were intolerable based on the employer shunning and humiliating her, ordering her to do potentially illegal things, and refusing to consider raising her pay in order to force her to

resign. *Id.* at 663–64. Bozue's evidence of unequal treatment by her supervisors and Mutual's denial of her promotion is simply not comparable.

*Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993), dealt with constructive discharge due to a failure-to-promote under the District of Columbia Human Rights Act, rather than Title VII or the MHRA. But even here, the plaintiff supported her constructive discharge claim with strong evidence of discriminatory animus, including "numerous sexist comments . . . directed toward her and other female employees, as well as the going-away party with the cake in the shape of a [scantily clad] woman and the derogatory comments about women which were made at that party." *Id.* at 364. Bozue does not present similar evidence to show intolerable working conditions, as she provides relatively minor examples of discriminatory conduct.

Finally, *Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007), is inapplicable. *Wallace* is a Uniformed Services Employment and Reemployment Rights Act (USERRA) case involving disciplinary actions allegedly based on the plaintiff's military status, holding little precedential value for Bozue's claim.

Bozue next argues that she could not remain in her job because there was no reasonable chance that Mutual would resolve the alleged sex discrimination, citing *Ogden v. Wax Works*, 214 F.3d 999 (8th Cir. 2000), *Nelson v. Wahpeton Pub. Sch. Dist.*, 310 F. Supp. 2d 1051 (D.N.D. 2004), and *Streitz v. Juneau*, 940 S.W.2d 548, 551 (Mo. Ct. App. 1997). *Streitz* is inapplicable, as it is an unemployment benefits case. *Streitz*, 940 S.W.2d at 551. *Ogden* and *Nelson* dealt with sexually harassing conduct such as unwelcome physical advances, physical and verbal threats, and touching in private bodily areas, which the employers failed to address even after the plaintiffs complained. *Ogden*, 214 F.3d at 1008; *Nelson*, 310 F. Supp. 2d at 1058.

Bozue did not suffer the same kinds of conduct as the plaintiffs in *Ogden* and *Nelson*, nor did she report discriminatory conduct to Mutual when she had the chance.  *See id.*  Although she alleges that she experienced discrimination throughout her tenure at Mutual, she never complained to Mutual of sex discrimination.  When Cochran told Bozue she was not selected for the General Manager position, Bozue commented "good ole boys club" and asked Cochran if she did not get the position because she was a woman, which Cochran denied. After hearing Cochran's response, Bozue never told Cochran that she disagreed or that she believed she was the victim of discrimination.  Over her entire tenure at Mutual, Bozue never made a formal complaint of discrimination, despite knowing how to do so because of her extensive prior experience working in human resources.

Bozue did not attempt to resolve her claims of discrimination with Mutual, therefore she cannot claim that her working conditions were objectively intolerable because Mutual would not do anything about the alleged discrimination.  *Davis*, 421 F.3d at 706 ("An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." (quoting *Tidwell*, 93 F.3d at 494)); *Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082, 1086 (8th Cir. 1998) (affirming summary judgment for employer on constructive discharge claim because employee did not pursue internal grievance procedure).

### 2.        Reasonable foreseeability

In addition to presenting evidence that her working conditions were objectively intolerable, Bozue must also show that Mutual could have reasonably foreseen that the intolerable working conditions would cause her to quit.  *See Davis*, 421 F.3d at 706.  Bozue does not present any evidence that Mutual could have foreseen her resignation.

Corpas did not want her to quit, and her resignation surprised Cochran.  Cochran said in his deposition that he "did not want to lose" Bozue and that he "thought she had potential to really develop. [Cochran] thought [Corpas and Bozue] would make a good team. They would complement each other and they would learn from each other."  Cochran Dep. 248:21–248:22, 249:4–249:10.  Mutual even gave Bozue a $7,500 bonus in 2017, which she received after the General Manager promotion decision and just several months before her resignation.  This act shows that Mutual did not intend or reasonably foresee that she would quit due to intolerable working conditions.  Bozue may have lost out on a promotion, but she still held a management position at Mutual, supervising numerous insurance agents.

The Court concludes that the evidence presented by Bozue is insufficient to establish a claim of constructive discharge.  Mutual did not create objectively intolerable working conditions for Bozue, nor could it have reasonably foreseen that Bozue's working conditions would force her to quit.  Mutual is entitled to summary judgment on Bozue's constructive discharge claim.

Accordingly, the Court grants Defendant's [42] Motion for Summary Judgment.

So Ordered this 28th day of April, 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**